**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 16-cv-01939

**THE ROYBAL CORPORATION; and RONALD ROYBAL and MICHAEL ROYBAL as owners of The Roybal Corporation;**

      Plaintiff,

v.

**CITY AND COUNTY OF DENVER SCHOOL DISTRICT NO. 1, in the State of Colorado; and CITY AND COUNTY OF DENVER SCHOOL DISTRICT NO. 1 BOARD OF EDUCATION**

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

**<u>INTRODUCTION</u>**

1.  This action is brought against Defendants Denver School District No. 1 ("District") and Denver School District No. 1 Board of Education ("Board"):

    a.  to remedy a violation of discrimination suffered by Plaintiffs, as individuals of Hispanic origin and owners of a certified minority business enterprise, on the basis of national origin discrimination and retaliation in violation of 42 U.S.C. § 1981.

    b.  to remedy violations of Plaintiffs' constitutional right to equal protection, to be free from retaliation, and right to publicly speaking against Defendants as guaranteed under the First and Fourteenth Amendment of the United States Constitution as enforced through the Civil Rights Act of 1871, 42 U.S.C. § 1983.

## FACTS RELEVANT TO JURISDICTION AND VENUE

2. This action is filed pursuant to federal law. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

3. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b) as the unlawful practices were committed within the State of Colorado.

## PARTIES

4. Plaintiff The Roybal Corporation ("Plaintiff Corporation") is a registered Colorado corporation with the Colorado Secretary of State and has been in existence since 1982. Plaintiff Corporation is an architectural firm owned by Mike Roybal and Ronald Roybal and it is a certified minority owned business. Plaintiff Corporations primary business address is 7600 E. Eastman Avenue, Suite 101, Denver, Denver County, Colorado.

5. Plaintiff Ronald Roybal ("Plaintiff R. Roybal") is a Colorado licensed architect and part owner of Plaintiff Corporation. Plaintiff R. Roybal has been a practicing architect since February 20, 1976. Plaintiff R. Roybal is of Hispanic national origin. Plaintiff R. Roybal is a citizen of the state of Colorado.

6. Plaintiff Michael Roybal ("Plaintiff M. Roybal") is a Colorado licensed architect and part owner of Plaintiff Corporation. Plaintiff M. Roybal has been a practicing architect since February 20, 1981. Plaintiff M. Roybal is of Hispanic national origin. Plaintiff M. Roybal is a citizen of the state of Colorado.

7. Defendant District is a Colorado public school district organized under the laws of the state of Colorado. Through its authority given by Defendant Board, Defendant District makes and enforces contracts as that term is defined under 42 U.S.C. § 1981. Defendant District is a

"person" as that term is defined under 42 U.S.C. § 1983. Defendant District, pursuant to the findings of a disparity report, underutilized Minority/Women Business Enterprises ("M/WBEs") during the relevant period. Defendant District acted under the color of law when it took discriminatory and retaliatory action against Plaintiffs. At all times relevant to this civil action, Defendant District is located at 1860 Lincoln Street, Denver, Denver County, Colorado.

8.    Defendant Board is a Colorado public school district board of education organized under the laws of the state of Colorado. Through its authority, Defendant Board makes policy and other decisions involving the making and enforcing of contracts as that term is defined under 42 U.S.C. § 1981. Defendant Board is a "person" as that term is defined under 42 U.S.C. § 1983. Defendant Board, pursuant to the findings of a disparity report, had a policy resulting in the underutilization of Minority/Women Business Enterprises ("M/WBEs") during the relevant period. Defendant Board acted under the color of law when it took discriminatory and retaliatory action against Plaintiffs through its decision and policy making processes. At all times relevant to this civil action, Defendant Board is located at 1860 Lincoln Street, Denver, Denver County, Colorado.

## **FACTS**

9. In November 2008, Denver voters voted in favor of a $454 million bond for the Denver Public Schools ("DPS") 2008 Bond Program Implementation.

10. The stated purpose for the bond was to address critical maintenance and facilities improvement.

11. The bond program would run for five (5) years with work scheduled to commence in 2009.

12. Defendants did not complete projects within the five (5) year period and were awarding contracts for work through 2015.

13. In an October 22, 2012 slide presentation developed by Defendant District, it stated to the public that 20.56% of professional services work was awarded to "diverse" businesses.

14. In the same slide, Defendant District stated to the public that 28.17% of the General Construction Contractor work was awarded to "diverse" businesses.

15. Defendants did not publicly define the definition of "diverse" in the slide.

16. In 2012, Defendants publicly announced that it would seek another Bond Program for 2012.

17. Plaintiffs, concerned about the lack of M/WBE contract awards under the 2008 Bond Program, asked to meet with Defendant District to advocate for inclusion of qualified minority professional and construction contractors for the 2012 Bond Program.

18. Prior to the vote on the 2012 Bond Program, Plaintiffs met with DPS Board Member Arturo Jimenez; DPS Community outreach staff members, Jessie Ogas and Ramon Bargas; Facility Manager Trena Deane; and Project Manager J.T. Allen.  Plaintiffs also met with DPS Bond Community Outreach staff member, Benita Duran.

19. During those meetings, Plaintiffs expressed their opposition to the over expansive manner by which Defendants were defining "diverse" business.

20. In November 2012, Denver voters passed a $515 million Bond Program.

21. On December 19, 2012, Defendants initiated an Open House with all interested design professionals and construction companies.

22. Concerned that design and construction firms were already being pre-selected on select projects without using any formal selection process, Plaintiffs spoke with George Latuda, DPS Chief of Construction; Jimenez; and Happy Haynes, DPS board member.

23. Plaintiffs also met with the Committee on City and Airport Fairness ("CCAF) to express their concerns.

24. CCAF is a community-based organization that includes certified Minority and Women Business Enterprises ("M/WBEs"), including Plaintiffs.

25. On numerous occasions, CCAF met with Defendants to discuss Defendants' statistics concerning the inclusion of "diverse" businesses contracting program for design and construction industry.

26.  As part of the meetings, and prior to May 2015, Plaintiffs utilized Defendants published diversity inclusion numbers, breaking out the M/WBE utilization by DPS on the 2008 Bond Program, to show that a little over two (2) percent of contract work awarded through the 2008 Bond Program was awarded to M/WBEs.

27. When certified Women Business Enterprises were removed from the statistics, certified Minority Business Enterprises were awarded less than one (1) percent of the work under the 2008 Bond Program.

28. As of October 1, 2015, the DPS student population was American Indian (.6%), Asian (3.3%), Black (13.8%), Hispanic (56.1%), White (22.6%), and Other (3.7%).  Spanish speaking students represent 37 percent of the student population.

29. Over the course of years, minority student population statistics, specifically Hispanic student population numbers were cited to DPS officials as a plea by Plaintiff and members of CCAF to encourage the awarding of contracts to M/WBEs.

30. Plaintiffs and CCAF members continuously reminded DPS officials that Hispanic and other communities of color voted in favor of bond initiatives, which increased these communities' taxes for children.

31. Plaintiffs and CCAF members continuously reminded DPS officials of the benefits to children of color in seeing qualified M/WBE contractors working on DPS buildings, including the design and construction of schools within communities of color.

32. Despite Plaintiffs' and CCAF members' expressed concerns, Defendants refused to acknowledge the discriminatory disparity in the awarding of contracts to M/WBEs.

33. Plaintiff and CCAF members asked a third party to review of their findings.

34. Dr. Luis Torres, DPS Bond Oversight Committee member, reviewed the findings of CCAF and Plaintiffs.  After his review of the relevant information, Dr. Torres found that Defendants awarded less than two (2) percent of professional design and contract under the 2008 Bond Program to M/WBEs.

35. Analysis of Defendants diversity statistics further revealed that the definition of "diversity" considered all small business as "diverse business," thereby skewing the numbers.

36. On October 22, 2012, Defendants presented to the public, outlining their definition of "diverse" businesses.  According to Defendants, all small businesses, regardless of ethnic, racial or gender makeup were considered.

37. Astounded by Defendants brazen attempts to water down diversity statistics, Plaintiffs and CCAF requested a meeting with DPS Superintendent Tom Boasberg to discuss their findings with respect to Defendants' history of discriminatory contracting practices with M/WBEs.

38. On June 4, 2013, Veronica Barela ("Barela"), on behalf of CCAF, sent a letter to Boasberg memorializing two meetings with Boasberg occurring on April 25, 2013 and May 23, 2013. In particular, four areas of concern were discussed: (1) Certification; (2) Qualifications; (3) Selection Process; and (4) Data Tracking.

39. Barela specifically mentioned the concern of the low utilization rate of the M/WBE community on past and current DPS capital improvement Bond Programs and a lack of transparency with respect to the design and construction selection and contracting process.

40. Barela sought public information related to all design and construction or design/build projects that had been awarded or are pending award under the DPS 2013 Bond Program.

41. On June 28, 2013, Trena Deane ("Deane"), Executive Director of Facility Management, responded to Barela's June 4, 2013 letter. The selected information provided by Deane was unresponsive to Barela's request.

42. On July 2, 2013, Barela sent a letter to Boasberg objecting to the lack of response by Defendant District.

43. On July 9, 2013, Barela again sent a letter to Deane objecting to the lack of a complete response to the public records request.

44. For the next year, CCAF, Plaintiffs and Defendants continued to meet to discuss the discriminatory contracting practices of Defendants. Plaintiff continued to offer solutions to Defendants, including the commissioning of a disparity study.

45. Approximately in October 2014, Boasberg sent out a newsletter to the community to report on Defendant District's alleged progress with minority contracting. What Boasberg did not advise the community was that Defendant District's minority contracting numbers were inflated in minority contracting numbers by including all small businesses.

46. On October 9, 2014, Barela sent a letter to Boasberg objecting to his inflation of the numbers. She specifically pointed out CCAF's objection to the use of small businesses to falsely prop up M/WBE numbers. Barela noted that one business highlighted by Boasberg, Eidos Architects, is not an M/WBE firm. In fact, Eidos Architects is a white male owned firm.

47. In an effort to continue conversations with Defendant District, CCAF sent some notes to counsel for Defendants challenging Defendants' decision to use disreputable certification of M/WBE firms. It was recommended that Defendants mirror the comprehensive certification process utilized by the City and County of Denver and the Colorado Department of Transportation, which takes into account: 1) 51 percent ownership by women and/or minority owners; 2) establishes a net worth threshold for the 51 percent owner; and 3) establishes size standards based on the type of business.

48. It was explained to Defendants that these major elements serve to certify M/WBE firms that are not financially dominant in their industry, that the owners are not wealthy beyond limits set for the program, and that the business is in fact owned by a woman or minority. In turn, CCAF advised that these safeguards reduce the opportunities for fraud and abuse.

49. Using Defendants own data, CCAF highlighted those firms identified by Defendants as M/WBE firms that are not and cannot be certified by the City and County of Denver's certification process.

50. Finally, Defendants agreed to commission a disparity report to ascertain if there were disparities in awarding contracts to M/WBEs.

51. On November 20, 2014, Defendant Board implemented an Equitable and Inclusive Contracting Policy.  The policy specifically stated the following:

> *…school district administrators and officials subsequently hired MGT of America to examine the school district's procurement practices and determine whether any current school district policies and procedures have been, or are barriers to meaningful participation by MWBEs.  The MGT disparity study presented to the School Board of Education identified that current practices contributed to the underutilization of ready, able and willing MWBEs in the construction industry operating in the Denver Metropolitan area.*
>
> *The Board of Education, upon the receipt and acceptance of the MGT disparity study, authorizes the Superintendent or designated representative(s) to take all necessary and reasonable action required to ensure that all businesses, principally those identified as underutilized MWBEs, are afforded a fair and equitable opportunity to provide their construction and construction-related services and goods to the MWBEs, or that can increase the utilization of MWBEs.*

52. On December 14, 2014, Boasberg sent a letter to CCAF and expressed his understanding that "efforts should focus on providing opportunities to business owners from historically disadvantaged communities, not just businesses who meet an expansive definition of Small Business Enterprises (SBEs)… once top earners are removed from the analysis, the District's utilization rates decreased significantly."

53. Boasberg committed to not using SBEs, who are not certified as MWBEs, as a count towards the District's diverse business inclusion goals.  Boasberg also committed to exploring "a potential pilot program designed to give MWBEs opportunities to perform leading roles on projects so that they can gain the experiences needed to grow and develop into leading firms in our construction program."

54. Boasberg finished his letter to CCAF stating, "I also understand and respect your criticisms of the District's record of underutilization."

55. Unfortunately, while the disparity study was being conducted, Defendants continued its discriminatory awarding practices without changing anything.

56. The final DPS Disparity Report (the "Report") was completed on February 13, 2015. The Report verified that M/WBE firms were discriminated against in the contracting of professional design and construction contracts.

57. Defendants established M/WBE goals and a goals committee was formed with DPS Bond projects containing M/WBE goals.

58. After the M/WBE goals setting was started, CCAF and Plaintiffs discovered that Defendants continued to accept third party M/WBE certification agencies, which allowed the certification of firms without regard to financial or economic status of businesses.

59. The two agencies are Rocky Mountain Supplier Development Council (RMMSDC) and Women's Business Enterprise National Council (WBENC)

60. Neither the State of Colorado nor the City and County of Denver accept certification from these two agencies.

61. In fact, the State of Colorado and the City and County of Denver specifically exclude M/WBE certification from these two agencies for government funded contracts.

62.    Defendants' decision to accept certification from these two agencies results in the consideration of wealthy, large, non-M/WBE compliant firms being certified for contracts awarded by Defendants.  These firms, in turn, are used by Defendants' in their definition of M/WBE statistics.

63. CCAF requested a list of contracts from Defendants showing the prime firms and their sub-contractors for each contract. CCAF received a spreadsheet from Defendants showing contracts awarded for the 2008 Bond Program up through October 15, 2014.

64. When CCAF and Plaintiffs removed the firms that were not M/WBE certified by the State of Colorado and City and County of Denver certification standards, the M/WBE utilization dropped significantly. The contracts showed the following results:

| **Professional Architectural and Engineering Contracts** | Total Awarded: $15,826,025 |
|---|---|
| Prime A&E Firms | Black Owned – 0.27% <br> Hispanic Owned – 0% |
| Sub-consultant A&E Firms | Black Owned – 2.43% <br> Hispanic Owned – 0.18% |
| **Construction Contracts** | Total Awarded: $206,306,939 |
| Prime General Contractors | Black Owned – 0% <br> Hispanic Owned – 0.56% |
| Sub-Contractors | Black Owned – 0% <br> Hispanic Owned – 1.47% |

65. CCAF and Plaintiffs pointed out to Defendants that the M/WBE goals that Defendants were contemplating on using would only provide opportunities to sub-consultants and sub-contractors.

66. CCAF and Plaintiffs recommended the implementation of a Pilot Program designed to encourage the use of M/WBE firms as the Prime Architect/Engineer and as the Prime General Contractor on significant projects.

67. This Pilot Program idea was first introduced to Defendants in May 2013, without any positive response from Defendants.

68. Defendants would not agree on selection criteria and they would not agree on projects where the Pilot Program would apply.

69. Two years of this vacillation went on before Defendants finally created a Request for Proposal for the Pilot Program.

70. On June 18, 2015, Plaintiff R. Roybal addressed Defendant Board of Education to discuss its discriminatory contracting practices.  Plaintiff R. Roybal complained about the lack of certified M/WBE firms on construction projects, resulting in less than two (2) percent of the $454 million 2008 Bond Program contracts going to certified M/WBE firms.  Plaintiff R. Roybal specifically objected that minority businesses were simply not being utilized.  Plaintiff R. Roybal requested that Defendant Board's selection process be made transparent by the significant inclusion of voting members from the community on contract selection committees.

71. On June 26, 2015, the project selected for the Pilot Program was for the renovation of Swansea Elementary School (RFP 15-BS-2552).  This project had a budget of approximately $10 million in construction cost.

72. The M/WBE goals set for the Architect/Engineering contract was for 70 percent and the M/WBE goal for the Construction Contract was for 50 percent.

73. In May 2015, Plaintiffs developed the Master Plan for the Swansea Elementary School project and were innately familiar with the needs for the project.

74. Plaintiffs applied for RFP 15-BS-2552 as the prime architect.

75. As part of the application process, all prospective architectural consultants had to develop a diverse business outreach plan.  The diverse business outreach plan was given a score of 25 total points to a Vendor "who commits to the highest Diverse Business Inclusion commitment."

76. Applying Vendors also were required to sign a Diverse Business Inclusion Commitment form recognizing that the Project Goal required a commitment that 70 percent of the Project's total work shall be performed by certified M/WBEs.

77. Despite Plaintiffs' and CCAF's continued protestations, Defendants accepted the M/WBE certifications from MPSDC and WBEC.

78. Plaintiffs reached the final three applying Vendors and were scheduled for an interview that would be video recorded.

79. During the interview, the video recording completely stopped.

80. A second firm, Anderson Mason Dale ("AMD"), also reached the final three firms. During their recorded presentation, representatives from AMD would not commit to the 70 percent goal program.

81. In response to their lack of commitment to the 70 percent goal program, DPS Board Member Rosemary Rodriquez stated the following:

> *Can I underscore something?  So I face my community, I get a lot of feedback about diversity and accountability.  Sometimes I get beat up and other times it's not so bad.  The public nature and the fact that we are going for another bond in 2016 or we are contemplating it, this accountability for people like me who have no role in this department decision about a day-to-day project requires, but I have to answer for it to the community.  I just want to raise that, because it was a big deal in the last bond and it's probably going to be a big deal in 2016.*

82. AMD refused to commit to the 70 percent goal.  At one point a representative from AMD made the comment, "So to be clear what I am saying.  We are not going to pay somebody for what they are not doing, right?  They either got to work or…."  At that moment, the video recording stopped.

83. On August 14, 2015, Plaintiffs received notification that AMD received the award for the Swansea project.  Only 1.64 points separated AMD's score from Plaintiffs.

84. On August 17, 2015, Plaintiffs appealed the denial of their application.  Again, as in the past, Plaintiffs objected to the discriminatory manner by which Defendants award architectural and construction contracts.

85. On September 1, 2015, one selection committee member, Heather Noyes, sent an email to Plaintiffs expressing her disgust that Plaintiffs were not selected.  Noyes stated, "My response to this news ranged from heartbreaking disappointment to disgust.  When I saw the video camera, my heart sank a bit.  And when there was complete silence from the selection committee – even when time remained on the clock – and it caused me some concern."

86. On September 4, 2015, Defendants responded to Plaintiffs appeal.  In the response, Defendants acknowledged meeting with Plaintiffs in the past to discuss the problems with Defendants disparity in awarding contracts.  But, Defendants denied discriminating against Plaintiffs.

87. Defendants then admitted that on the total points awarded for Diverse Business Outreach, AMD received 17.5 points out of 25, whereas Plaintiffs received 24.5 points out of 25.

88. Defendants have yet to explain how AMD received 17.5 points when it remained uncommitted, and the video showed AMD's belligerence, to the 70 percent goal project.

89. On October 19, 2015, Plaintiffs organized a protest in front of Defendants' administration building.  The purpose of the public protest was to raise awareness about Defendants' discriminatory contract awarding process.  Media attended and reported about the protest.

90. On December 13, 2015, Defendants issued an RFP for a $32 million project for the CP Bedrock project – RFP 16-BS-AE2601.  The M/WBE goal listed by Defendants was 50 percent. The minimum requirements set by Defendants would serve as a detriment for certified M/WBE firms to meet.

91. Plaintiffs applied for this project.

92.  Despite their decades years of experience, on February 23, 2016, Plaintiffs were again denied a contract with Defendants.

93. The job was awarded to a firm that is not certified M/WBE by the City and County of Denver, it is a larger firm and may not be 51 percent owned by a minority or woman.

## FIRST CAUSE OF ACTION
### (42 U.S.C. § 1981 – National Origin Discrimination)

94. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

95. Plaintiffs are members of a protected class by virtue of their national origin, Hispanic, and are protected from discrimination under § 1981.

96. Plaintiffs are certified minority business owners who have a right to make and enforce contracts without discrimination.

97. Defendants' refusal to award contracts to Plaintiffs, for which they were otherwise qualified, was intentionally or purposefully discriminatory based on their national origin, Hispanic.

98. As a proximate result of Defendants' violation, Plaintiffs suffered and continue to suffer injuries, damages and losses.

## SECOND CAUSE OF ACTION
### (42 U.S.C. § 1981 – Retaliation)

99. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

100.    Defendants have a proven history of discriminating against M/WBE firms.

101.    Plaintiffs publicly objected to Defendants' discriminatory practices.

102.    Defendants retaliated against Plaintiffs by refusing to provide them contracts, for which they were otherwise qualified.

103.    There exists a causal connection between Plaintiffs' objections to Defendants' discriminatory practices and the adverse actions taken against Plaintiffs.

104.    As a proximate result of Defendants' violation, Plaintiffs suffered and continue to suffer injuries, damages and losses.

### THIRD CAUSE OF ACTION
### (42 U.S.C. § 1983 Denial of Equal Protection)

105.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

106.    Defendants acted under the color of state law, pursuant to a policy, custom or practice, to deprive Plaintiffs the equal protection of the law, as guaranteed under the United States Constitution and Colorado Constitution.

107.    The deprivation was based on Plaintiffs' national origin, Hispanic, and in retaliation for their complaints of discrimination.

108.    Plaintiffs engaged in activities and speech in opposition to discriminatory contract awarding practices prohibited by the Equal Protection Clause of the Fourteen Amendment to the United States Constitution.

109.    A disparity report demonstrates and Defendants acknowledge that they have engaged in discriminatory contract awarding practices involving M/WBE firms.

110.    Defendants are not entitled to qualified immunity as the law and the publicly known disparity report findings clearly established Plaintiffs' constitutional rights to be free from discrimination and retaliation.

111.    Plaintiffs spoke out on behalf of the public and themselves because they had a reasonable and good faith belief that Defendants were continuing their proven practice of discrimination.

112.    Defendants failed to properly monitor, train, supervise and/or discipline members of their Board and employees regarding anti-discrimination laws.  This inadequate monitoring, training, and/or supervision results from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendants.  Such failure to properly award contracts, train, and/or supervise was the moving force behind and proximate cause of Defendants' discrimination and retaliation against Plaintiffs and constitutes an unconstitutional policy, procedure, custom and/or practice.

113.    Defendants are deliberately indifferent to or tacitly approved of their Board members and employees' misconduct, which is performed through official custom, policy, or practice promulgated by the Board and decision makers, and that custom, policy, or practice was the moving force behind Defendants' unconstitutional acts.

114.    Defendants' acts were deliberate or in reckless disregard of Plaintiffs' constitutional and statutory rights and demonstrate an invidiously discriminatory and/or retaliatory animus as the motivating factor behind Defendants' actions.

115.    As a proximate result of Defendants' violation, Plaintiffs suffered and continue to suffer injuries, damages and losses.

**FOURTH CAUSE OF ACTION**
**(42 U.S.C. § 1983 – First Amendment Retaliation)**

116.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

117.    For years, Plaintiffs have publicly discussed Defendants' discriminatory contract awarding practices, involving public funds, during public meeting, at a school board meeting and at a protest designed to raise public awareness about Defendants' discriminatory contracts awarding practices.

118.    The media has reported on these public concerns, including reporting about the findings of a disparity report.

119.    Plaintiffs protected speech involving Defendants' discriminatory contract awarding practices involving public funds outweighs Defendants' interests in suppressing Plaintiffs' comments.

120.    Defendants' retaliated against Plaintiffs by refusing to award them contracts, for which they are otherwise qualified, because of Plaintiffs' expressed speech.

121.    Defendants' denial in awarding contracts to Plaintiffs lacks cause because Plaintiffs were qualified to perform the contracts and Plaintiffs were committed to Defendants' diversity project goals.

122.    Defendants' unlawful acts of retaliation occurred within weeks and months of Plaintiffs' public complaints of Defendants' discriminatory contract awarding practices.

123.    Defendants' acts were deliberate or in reckless disregard of Plaintiffs' constitutional and statutory rights and demonstrate an invidiously retaliatory animus as the motivating factor behind Defendants' actions.

124.    As a proximate result of Defendants' violation, Plaintiffs suffered and continue to suffer injuries, damages and losses.

WHEREFORE, Plaintiffs respectfully pray this Court to grant the following relief:

a)  Declaratory relief and injunctive relief, as appropriate;

b)  Actual economic damages as established at trial;

c)  Any economic losses or injuries that Plaintiffs suffered to the present time or which Plaintiffs will probably suffer in the future, including but not limited to loss of earnings or damage to their ability to earn money in the future, and other expenses;

d)  Compensatory, consequential, nominal and special damages past, present and future, in amounts to be proven at trial, including mental pain and suffering, inconvenience, emotional stress, impairment of the quality of life, humiliation and embarrassment, injury to reputation, economic and non-economic losses, financial hardship, loss of earning capacity, and all other damages as provided by law or equity;

e)  Punitive damages for all claims as allowed by law in an amount to be determined at trial;

f)  Pre-judgment and post-judgment interest at the highest lawful rate;

g)  Attorney's fees and costs in this action; and

h)  Such other and further relief as allowed by law or in equity.

Respectfully submitted this **29th day of July**, 2016.

Joseph A. Salazar, Esq.
Smith Shellenberger & Salazar, LLC
14694 Orchard Parkway, Suite 210
Westminster, Colorado 80023

(303) 255-3588 Office
(303) 255-3677 Fax
E-mail: jas@ssslawyers.com
Atty. Reg. #35196

## **JURY DEMAND**

Plaintiffs request a trial by jury on all issues and claims.


Address of Plaintiffs:

THE ROYBAL CORPORATION
7600 East Eastman Avenue, Suite 101
Denver, Colorado 80231